Banco Comercial de Mayagüez, recurrente, *v.* El Registra-
dor de la Propiedad de Caguas, Sección Primera, recu-
rrido.

*Número:* CE-86-434          *Resuelto:* 15 de junio de 1990

*Luis Mojica Sandoz*, Registrador de la Propiedad recurrido; *Ángel L.
Alicea Parés*, abogado del recurrente; *Emilio Vidal Pérez Rosado*,
abogado de la Junta de Planificación de Puerto Rico, interventora.

## RESOLUCIÓN

A la anterior Moción de Reconsideración, *no ha lugar.*

Lo acordó el Tribunal y certifica el señor Secretario General
Interino. El Juez Asociado Señor Negrón García emitió opinión
disidente, a la cual se unió el Juez Asociado Señor Rebollo López.

(*Fdo.*) Heriberto Pérez Ruiz
*Secretario General Interino*

—O—

Opinión disidente del Juez Asociado Señor Negrón García, a la
cual se une el Juez Asociado Señor Rebollo López.

(En reconsideración)

A petición del Registrador de la Propiedad (el Registrador),
reconsideraríamos la decisión del 30 de abril de 1988 (*Banco
Comercial v. Registrador*, 118 D.P.R. 773 (1987)).

Distinto a cuando resolvimos originalmente, en esta etapa
tenemos el beneficio adicional, en calidad de interventora, de la
Junta de Planificación de Puerto Rico. Concluimos que la Admi-
nistración de Reglamentos y Permisos (A.R.Pe.) debe evaluar el

arrendamiento que el Registrador se negó a inscribir para determinar si procede el permiso o es una lotificación exenta de acuerdo con el Art. 78 del Reglamento de Lotificación (Reglamento Núm. 3 de la Junta de Planificación).

## I

Taco Burguer Corporation, propietaria de una finca[1] en Caguas, se propuso construir el Centro Comercial Cagüitas Mall, compuesto de un edificio principal y cuatro *estructuras* independientes (*free standing units*). Como parte de estas gestiones, el 30 de enero de 1986 celebró contrato de arrendamiento con el Banco Comercial de Mayagüez (el banco). Estipularon que el Banco (la arrendataria) ocuparía una porción de la finca, parcela de terreno de entre tres mil (3,000) y tres mil doscientos (3,200) pies cuadrados donde construiría una estructura. *Terminado el arrendamiento, la edificación pasaría a ser propiedad de Taco Burger, Corp.* (la arrendadora).

El 11 de febrero de 1986 fue presentado para su inscripción el título del mencionado arrendamiento contenido en la Escritura Núm. 17 otorgada ante el notario Ángel L. Alicea Parés. El entonces Registrador de la Propiedad, Lcdo. Luis Mojica Sandoz, notificó como requisito para la inscripción la presentación de la autorización de A.R.Pe.[2] El 2 de abril de 1986 el Registrador notificó nuevamente el defecto. Añadió que posteriormente se había presentado una hipoteca que gravaba la finca. Obviamente, el Registrador le advertía la posibilidad de que la hipoteca tuviera

---

[1] "URBANA: Parcela A – Parcela de terreno en el barrio Bairoa de Caguas, compuesta de Tres punto dos cero cuatro dos cuerdas (3.2042 cdas.), equivalentes a Doce mil Quinientos noventitrés metros cuadrados con siete mil novecientas treintitrés diez milésimas de otro (12593.7933) y en lindes, por el Norte, con la Sucesión de Rosa Molina Casanova y parcela vendida a la Eastern Auto Sales, Inc.; por el Sur, con el río Cag[ü]itas; por el Este, con una parcela a dedicarse a calle marginal de la carretera estatal número uno que transcurre de San Juan a Ponce; y por el Oeste, con Blanca Longo de Agudo." Anejo 1 a Alegato del recurrente, pág. 20.

[2] "No puede arrendarse la parcela de terreno descrito sin autorización de ARP[E]. Si la edificación está en proyecto quizás se podría inscribir el derecho a construir, es decir, el derecho de superficie, pero tal como está expresado el propósito, no tiene entrada al Registro." Anejo 2 a Alegato del recurrente.

un rango superior que el arrendamiento si no se subsanaban los defectos en el término dispuesto por ley.

El 1ro de mayo de 1986, el Banco sometió copia de la solicitud del permiso de urbanización y la solicitud del permiso de construcción del edificio aprobada por A.R.Pe. El 9 de mayo de 1986, el Registrador señaló:

Los documentos presentados por usted en nada corrigen los defectos apuntados. Es preciso un permiso o plano de inscripción final de ARP[e] para que pueda crearse derecho alguno sobre una parcela de terreno que resulta ser una *segregación*. Tampoco puede concederse derecho sobre edificación que no se ha inmatriculado como dispone el Art. 198.2 del Reglamento Hipotecario. (Énfasis suplido.) Anejo 7 a Alegato del recurrente.

Inconforme con la calificación, el Banco acudió ante nos cuestionando que el Registrador considerara el arrendamiento como una segregación que requiriera el correspondiente permiso de A.R.Pe. Ante esos hechos, revocamos. Nos fundamentamos en el razonamiento siguiente:

En el presente caso el Banco Comercial recurrente presentó, para su inscripción en el Registro de la Propiedad, una escritura pública de contrato de arrendamiento de una parcela de terreno que forma parte de una finca destinada a funcionar como centro comercial. En el contrato se establece que el recurrente Banco Comercial será responsable de construir la edificación a ser utilizada por ellos y que ésta, luego de terminado el arrendamiento, pasaría a ser propiedad del centro comercial. De lo anterior se desprende que no estamos ante una segregación de una parcela de terreno y sí ante uno de los casos de excepción que permite el Art. 78 del Reglamento de Lotificación, *supra*. Para que estemos ante una segregación es necesario que se *separe* parte de una finca para formar una *finca nueva*. R. Roca Sastre, *Derecho Hipotecario*, 7ma ed., Barcelona, Ed. Bosch, 1968, T. II, pág. 519. En los casos en que se efectúe una segregación, la modificación lleva consigo la correspondiente minoración o eliminación de la finca registral correspondiente. Roca Sastre, *op. cit.*, pág. 495. Ninguna de estas cosas ocurre en el presente caso. La finca principal no sufrió reducción en cabida ni se formó una finca nueva, sino que meramente se arrendó una parcela de terreno, la cual, al finalizar el término del contrato de

arrendamiento, pasaría de nuevo a manos del arrendador, incluyendo la edificación que se haya construido en la misma. El contrato de arrendamiento en el presente caso describe detalladamente la organización del Centro Comercial Cagüitas Mall; la misma consiste en alquilar varias parcelas de terreno pertene-cientes a la finca principal. En éstas los arrendatarios son responsables de construir las edificaciones comerciales donde ubicarán sus respectivos negocios. Los edificios a construirse en el predio de terreno estarán todos dedicados a un mismo fin principal, el comercio, por lo que es de aplicación la excepción del Art. 78 del Reglamento de Lotificación, *supra*, ya que ésta facilita la construcción de este tipo de proyecto.

En consecuencia, al no tratarse de una segregación estamos ante un arrendamiento, comprendido dentro de la definición de lotificación que da la ley de A.R.P[E]., *supra*, que cae bajo las excepciones establecidas por el Reglamento de Planificación, *supra*. Por esto no era necesario presentar el correspondiente permiso de A.R.P[E]. como requisito previo para la inscripción de la escritura en el Registro de la Propiedad. (Énfasis en el original.) *Banco Comercial v. Registrador*, págs. 780–781.

## II

El concepto "lotificación" se incorporó a nuestro ordenamiento jurídico mediante el Art. 2 de la Ley de Planificación, Urbanización y Zonificación de Puerto Rico, Ley Núm. 213 de 1942. Se definió como "la división o subdivisión de un solar, predio o parcela de terreno en dos o más partes para la venta o para una nueva construcción, e incluye urbanización como hasta ahora se ha usado en la legislación de Puerto Rico".[3] *Rivera v. Registrador*, 64 D.P.R. 461, 463 (1945); *Sepúlveda v. Registrador*, 64 D.P.R. 449 (1945). Véanse, además: R.R. Fuertes, *La lotificación rural y su procedimiento*, 10 Rev. C. Abo. P.R. 182 (1947); A. García Martínez, *Algunos aspectos de la lotificación y zonificación en Puerto Rico*, 23 Rev. Jur. U.P.R. 337 (1954); R. Picó, *Los primeros años de la planificación en Puerto Rico*, VIII Plerus 25, 39–41

---

[3] Las Leyes Núm. 69 de 3 de agosto de 1925 y Núm. 11 de 11 de abril de 1931 utilizaban el término "urbanización de terrenos".

(1974); R. Alonso Alonso, *La nueva Ley de Planificación de Puerto Rico*, IX Plerus 1, 36–37, (1975).

Esa escueta definición suscitó varias controversias que ameritaron su enmienda. Véanse: Martínez v. Registrador, 73 D.P.R. 210 (1952); *Enríquez v. Registrador*, 65 D.P.R. 407 (1945); *Fortunet v. Junta de Planificación*, 67 D.P.R. 265 (1947); *Picó v. Corte*, 66 D.P.R. 159 (1946). La Ley Núm. 388 de 11 de mayo de 1950 amplió el concepto:

> "Lotificación" significa la división o subdivisión de un solar, predio o parcela de terreno en dos o más partes para la venta, traspaso, cesión, arrendamiento, donación, usufructo, uso, censo, fideicomiso, o para cualquier otra transacción así como para un nuevo edificio e incluye también, urbanización como hasta ahora se ha usado en la legislación de Puerto Rico; y además una mera segregación. 1950 Leyes de Puerto Rico 905, 907.

En *Martínez v. Registrador*, supra, págs. 214–215, ya vigente la nueva definición, indicamos que "[s]i bien la *hipoteca*, como puede verse, no se menciona por su nombre en el texto arriba transcrito, no puede haber dudas de que está incluida en la frase 'o para cualquier otra transacción', pues este concepto general se aplica, en vista del propósito del estatuto, a todo acto mediante el cual se someta o exponga una finca, predio o parcela a ser dividida materialmente, esto es, a que se formen dos o más partes de lo que antes constituía una sola. Tal es el propósito claro de la ley. *De no requerirse la autorización previa de la Junta para formar la nueva porción —tanto en los casos en que el acto o transacción en sí conlleve la formación inmediata de una nueva finca como en los que se deslinda o delimita materialmente sin formación inmediata de finca independiente— la ley resultaría ineficaz para cumplir el fin público que persigue,* pues fácil sería recurrir a la ejecución de una hipoteca para obtener a través de ese medio, lo que quizá no podría obtenerse si se intentara de otro modo". (Énfasis suplido.)

Como puede observarse, el término "lotificación" experimentó modificaciones y ampliaciones legislativas sustanciales que fueron

recogidas en nuestra jurisprudencia[4] para adaptarlo a las realidades cambiantes del desarrollo de Puerto Rico, de una sociedad agrícola a una industrial. El propósito básico es evitar que urbanizadores, proponentes y ciudadanos que acuden a los organismos planificadores obvien o burlen las disposiciones legales y reglamentarias aplicables y, mediante subterfugios, ganen acceso al Registro con una lotificación ilegal no considerada por A.R.Pe. *Preciosas V. del Lago v. Registrador*, 110 D.P.R. 802, 811 (1981).

En consonancia con esa trayectoria, el Art. 3(k) de la Ley Núm. 75 de 24 de junio de 1975, creadora de la Junta de Planificación, 23 L.P.R.A. sec. 62b(k), define "lotificación" así:

> . . . [E]s la división o subdivisión de un solar, predio o parcela de terreno en dos o más partes, para la venta, traspaso, cesión, arrendamiento, donación, usufructo, uso, censo, fideicomiso, división de herencia o comunidad, o para cualquier otra transacción; la constitución de una comunidad de bienes sobre un solar, predio o parcela de terreno, donde se le asignen lotes específicos a los comuneros; así como para la construcción de uno o más edificios; e incluye también urbanización, como hasta ahora se ha usado en la legislación de Puerto Rico, y, además, una mera segregación.

"La misma definición de 'lotificación' se repite [ad pédem lítterae] en el Art. 3 (h) de la Ley Orgánica de la Administración de Reglamentos y Permisos que es la Núm. 76 de 24 de junio, 1975 (23 L.P.R.A. sec. 71b(h))." *Preciosas V. del Lago v. Registrador*, supra, pág. 804.

Por otra parte, "segregación no es más que la separación de una parte de una finca de su matriz para constituir una finca distinta". *Mattei v. Registrador*, 94 D.P.R. 467, 471 (1967).

## III

Como puede deducirse de las definiciones anteriores, el término *lotificación* es hiperónimo del término *segregación*, lo que no establece una absoluta equivalencia entre ambos, ya que el

---

[4] En *Janer Vilá v. Registrador*, 115 D.P.R. 79, 84 (1984), resolvimos que el arrendamiento de un local no constituye una lotificación o segregación.

primero (lotificación) tiene una más amplia categoría semántica y puede, por lo tanto, aplicarse a un mayor número de situaciones. Véase Boletín de Divulgación Núm. 8 de la Junta de Planificación de Puerto Rico, citado por García Martínez, *op. cit.*, pág. 338 esc. 3. El término segregación, por otra parte, posee unos atributos específicos que lo limitan y particularizan dentro de las lotificaciones. No hay, por lo expresado, una correspondencia exacta e invariable entre los términos en discusión.

En el sentido técnico jurídico, la segregación, siendo una lotificación, posee un significado distintivo que la separa de otros tipos de lotificaciones. Sin embargo, como bien nos advierte la Junta de Planificación en su alegato, si bien nuestro sistema de planificación utiliza el término "lotificación" y no propiamente "segregación", la costumbre ha sido que tanto los técnicos de los organismos oficiales como los urbanizadores y otro público, los hayan utilizado indistintamente.

Al considerar esta precisión de significado, no hay duda de que el Registrador no utilizó el vocablo apropiado: debió indicar al Banco que el arrendamiento constituía una lotificación y no una segregación, como lo hizo. Es necesario considerar, aun así, que lo anterior no implica que el Registrador no tuvo razón al dictaminar que era necesario el permiso de A.R.Pe. para inscribir el arrendamiento. Un error de carácter nominal no altera el hecho sustancial de que el Registrador opinaba correctamente, pues la inexactitud en el acto de denominar no cambia la esencia de la razón sustantiva.

Vistas las diferencias conceptuales y semánticas, prestemos atención al *ratio decidendi* de nuestra opinión anterior. Allí acogimos la tesis del Banco, apuntalada en la supuesta exención del permiso de A.R.Pe. por aplicarle a su situación el Art. 78 del Reglamento de Lotificación (Reglamento Núm. 3 de la Junta de Planificación de 1954).[5] La Junta de Planificación considera

---

[5] "Artículo 78.—*Casos de Varios Edificios en un Solo Predio.*—En los casos de instituciones u otras organizaciones o entidades cívicas, docentes, religiosas, caritativas, de recreo, industriales, u otras, en que hayan de construirse varios edificios que, aunque

incorrecta dicha determinación. Arguye que distinto a lo resuelto por este foro, las excepciones a la disposición reglamentaria aludida se refieren a cementerios y lotificaciones de carácter rural. Aduce, además, que estas excepciones no operan por sus propios términos (*ex proprio vigore*). Tiene razón.

Ciertamente no correspondía a este Tribunal, como hizo, pasar juicio sobre la aplicabilidad del Art. 78 del Reglamento de Lotificación, *supra*, al arrendamiento presentado para inscripción en el Registro. Era necesario que la agencia facultada evaluara si la lotificación propuesta se ajustaba a los requisitos exigidos por la ley y los reglamentos. Por ende, no podía el Banco fundamentarse en el lenguaje amplio del Art. 78 del Reglamento de Lotificación, *supra*, para atribuirse automáticamente el derecho de exención establecido por el citado precepto. Era imperativo solicitar a A.R.Pe., agencia con la pericia necesaria y autoridad en ley, la evaluación de su caso y determinar si procedía el permiso o su dispensa. Sólo después de este trámite puede actuar el Registrador en observancia de la norma de que no puede hacerse ni *inscribirse* ninguna lotificación si no ha sido previamente aprobada o dispensada por la Junta (ahora A.R.Pe).[6] *Fernández v. Registrador*, 82 D.P.R. 539 (1961).

"La Ley no concede al registrador discreción alguna en cuanto a eximir de las obligaciones impuestas por la ley o los reglamentos. Su deber es rechazar el documento del cual se solicita inscripción si no se presenta el correspondiente plano aprobado

---

físicamente independientes, han de estar funcionalmente relacionados al mismo fin principal, la Junta podrá guiarse por la conveniencia de aceptar su establecimiento en un solo predio de terreno.

"En tales casos se someterá a la Junta un anteproyecto que incluya la ubicación de las edificaciones y cualesquiera vías a construirse, acompañándose, además, una descripción del proyecto y la relación del uso a dársele a las nuevas edificaciones.

"Si cualesquiera parte o partes de tal organización o entidad fuera más tarde cambiada a un uso principal independiente, la parte interesada vendrá obligada a cumplir cabalmente con las disposiciones del presente Reglamento." Art. 78 del Reglamento de Lotificación (Reglamento de Planificación Núm. 3 de la Junta de Planificación de 1954).

[6] La Ley Orgánica de la Administración de Reglamentos y Permisos de 1975 le asignó a A.R.Pe. las funciones operacionales que hasta ese momento desempeñaba la Junta de Planificación. Véanse: *The Richards Group v. Junta de Planificación*, 108 D.P.R. 23 (1978); *Asoc., C.D. Octubre v. J.A.C.L.*, 116 D.P.R. 326 (1985); *Junta de Planificación v. J.A.C.L.*, 109 D.P.R. 210 (1979).

por la Junta [A.R.Pe.] o la certificación de la correspondiente dispensa otorgada también por la Junta [A.R.Pe.]. Como en este caso no se presentó ni una ni otra cosa, actuó correctamente el registrador al denegar la inscripción del documento." *Rivera v. Registrador*, supra, pág. 466. Véanse, además: *Alicea v. Registrador*, 71 D.P.R. 592, 599 (1950); *Ramos v. Registrador*, 69 D.P.R. 708 (1949).

Por los fundamentos antes expuestos, reconsideraríamos y confirmaríamos la nota del Registrador. El contrato de arrendamiento no debería inscribirse hasta tanto la lotificación fuera aprobada o dispensada por A.R.Pe. y así se acreditara con los documentos complementarios correspondientes.